IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Angela Martin-Horn, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Unemployment Compensation | : | |
| Board of Review, | : | No. 1206 C.D. 2020 |
| Respondent | : | Submitted: February 18, 2022 |


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE LORI A. DUMAS, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                    FILED:  April 19, 2022


Angela Martin-Horn (Claimant) petitions for review of the October 26, 2020 order of the Unemployment Compensation Board of Review (Board).  The Board affirmed a referee's decision finding Claimant ineligible for benefits under section 402(e) of the Unemployment Compensation Law (Law),[1] which provides that a claimant shall be ineligible for benefits in any week in which her unemployment is due to willful misconduct connected with her work.  We affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

## I.  Background

Claimant[2] worked for Meadville Medical Center (Employer) as a substance abuse counselor from June 2015 to January 2020.  *See* Referee's Decision/Order (Referee's Decision) mailed June 22, 2020, Findings of Fact (F.F.) 1; *see also* Notes of Testimony, April 22, 2020 (N.T. 4/22/2020) at 3; Notes of Testimony, June 3, 2020 (N.T. 6/3/2020) at 26.  Employer discharged Claimant for willful misconduct following repeated and continued tardiness to work despite multiple warnings and corrective actions.  *See* F.F. 35.

Claimant applied for unemployment compensation (UC) benefits, for which the UC Service Center deemed her eligible.  *See* Internet Initial Claim Form dated Jan. 19, 2020, Certified Record (C.R.) at 006-009; Notice of Determination dated Jan. 31, 2020, C.R. at 028-030.  Employer appealed the UC Service Center's eligibility determination to a referee, and a hearing was conducted at which both parties testified.

At the hearing, Employer presented three witnesses and documentary evidence.  *See generally* N.T. 4/22/2020 & N.T. 6/3/2020.  Claimant, who was represented by counsel, presented her own testimony and that of her husband.  *Id.* Based on the testimony and documentary evidence presented, the referee determined that Claimant's repeated and continued tardiness at work violated Employer's tardiness policy and warranted her termination.  *See* Referee's Decision at 4. Therefore, the referee concluded that Claimant was ineligible for UC benefits under

---

[2] Claimant holds a master's degree in clinical mental health counseling.  *See* Referee's Decision/Order mailed June 22, 2020 (Referee's Decision), Findings of Fact (F.F.) 2; Certified Record (C.R.) at 286.

Section 402(e) of the Law for willful misconduct and reversed the determination of the UC Service Center. *See id.*

Claimant appealed to the Board, which affirmed the Referee's Decision by Decision and Order filed October 26, 2020. *See* Board Decision and Order mailed October 26, 2020 (Board Order). Based on the record created by the referee, the Board made the following findings.[3]

Employer maintains a specific attendance and tardiness policy with a point system and progressive discipline for repeated violations. *See* F.F. 5; *see also* Employer's Human Resources Policy HR-141 (Tardiness Policy), C.R. at 022-026. Pursuant to the Tardiness Policy, employees are expected to be ready to start work at the beginning of their scheduled shift. *See* F.F. 6; *see also* Tardiness Policy at 1-2, C.R. at 022-023. Employees can clock in on their computer or by swiping their identification badge. *See* F.F. 9. Employees clocking in any time after their scheduled shift commences are considered tardy. *See* F.F. 6; *see also* Tardiness Policy at 1, C.R. at 022. A tardy clock-in is considered a violation of the Tardiness Policy, with each individual tardy receiving half a point in the policy's points scheme. *See* F.F. 6 & 11; *see also* Tardiness Policy at 1, C.R. at 022. The Tardiness Policy does not provide for a grace period during which employees do not accrue points for clocking in after their shift has begun. *See* F.F. 7; *see generally* Tardiness Policy. Under the Tardiness Policy, amassing 10 total points is grounds for employee termination. *See* F.F. 8; *see also* Tardiness Policy at 4, C.R. at 025.

---

[3] The Board adopted and incorporated the findings and conclusions contained in the Referee's Decision in their entirety, adding the additional finding of fact that "[C]laimant told [] [E]mployer that some of her tardies were due to caring for her mother-in-law, as well as snowy weather and not feeling well." *See* Board's Order mailed October 26, 2020 (Board Order) at 1 (pagination supplied); C.R. at 311.

Claimant was aware of the Tardiness Policy and had been provided with a copy thereof. *See* N.T. 6/3/2020 at 4, 32.

In the Spring of 2019, Claimant asked to change her scheduled work start time to 10:00 a.m.[4] *See* F.F. 12; N.T. 6/3/2020 at 6. Employer accommodated the request. *See* F.F. 12; N.T. 6/3/2020 at 6. Nevertheless, Claimant accumulated 7½ points based on 15 instances of tardiness in less than 30 days, which resulted in Employer issuing a corrective action form (First Written Warning) and verbally counseling Claimant regarding her tardiness. *See* F.F. 11; *see also* First Written Warning, C.R. at 020-021. In a handwritten statement on the First Written Warning, Claimant mentioned her learning disability for the first time. *See* F.F. 13; *see also* First Written Warning at 1, C.R. at 020. Claimant also told Employer that her learning disability prevented her from properly judging time and reading analog clocks, and resulted in her requiring longer time to do certain tasks. *See* F.F. 13, 15. The First Written Warning provided an action plan whereby Claimant would meet with supervisors to review attendance requirements and would also outline methods she could use to ensure no further instances of tardiness occurred. *See* First Written Warning at 1, C.R. at 020.[5]

---

[4] Claimant actually made multiple requests to change her start time, first from 8:00 a.m. to 9:00 a.m., then from 9:00 a.m. to 10:00 a.m. *See* Notes of Testimony, June 3, 2020 (N.T. 6/3/2020) at 6. Employer granted Claimant's requests. *See* N.T. 6/3/2020 at 6.

[5] Specifically, the First Written Warning's Action Plan provided:

> [Claimant] will meet with Program Supervisor and Manager to discuss the necessity of arriving at 10AM on scheduled work day unless Program Supervisor has advised that her shift can start at a different time. [Claimant] will outline methods that will be used to ensure that no more incidents of tardiness occur, as this goal and any associated variable are within her ability to control.

First Written Warning at 1, C.R. at 020.

Following the First Written Warning, Claimant's instances of tardiness continued. In June 2019, Employer issued a second corrective action form (Second Written Warning) to Claimant after she accrued an additional 6 points based on 12 further incidents of tardiness since the First Written Warning. *See* F.F. 18; *see also* Second Written Warning, C.R. at 018-019. Claimant blamed these instances of tardiness on car trouble. *See* F.F. 19; *see also* Second Written Warning at 1, C.R. at 018. The Second Written Warning also provided an action plan that reviewed discussions Claimant had with her superiors in reference to her tardiness and informed Claimant that continued violation of the Tardiness Policy could subject her to additional corrective actions from Employer, up to and including termination from employment. *See* F.F. 20; *see also* Second Written Warning at 1-2, C.R. at 018-019.[6] Additionally, Claimant's Program Supervisor informed Claimant of the

---

[6] Specifically, the Second Written Warning's Action Plan provided:

> [Claimant] will again discuss more strategies for timely arrival with Program Supervisor and Manager. Program Supervisor had advised on possible service assistance for her vehicle and talked about various strategies for getting adequate transportation to work to avoid lateness (e.g., ride from spouse, ride from others, borrowing vehicles, provided number for trustworthy mechanic) and [Claimant] has stated that these have not been available in a reasonable time frame or not available on a regular basis. [Claimant] will outline methods that will be used to ensure that no more incidents of tardiness occur, and supervisory goal is that she recognizes the seriousness and importance of finding a reasonable solution to this problem. In addition[,] during discussion the need to remember to swipe in on arrival will be stressed as [Claimant] has missed 8 arrival swipes since the initial corrective action.
>
> If you either fail to demonstrate immediate and sustained improvement or further violate [Employer]/departmental policy, practice or procedure, you may receive additional corrective action, up to and including termination from employment.

Second Written Warning at 1-2, C.R. at 018-019.

5

requirement that she swipe in and out of her shifts with her identification card as well as offering suggestions to help Claimant arrive at work on time. *See* F.F. 21; *see generally* N.T.

In July 2019, Claimant's mother-in-law was diagnosed with pancreatic cancer. *See* F.F. 23. Claimant became her mother-in-law's primary caregiver until her mother-in-law's death in October 2019. *See* F.F. 23; N.T. 6/3/2020 at 31, C.R. at 231. Claimant informed Employer of her family situation and made a request for leave pursuant to the Family and Medical Leave Act (FMLA).[7] *See* F.F. 24. Her FMLA request was denied, however, as the request was based on the medical condition of her mother-in-law.[8] *See* F.F. 24; N.T. 6/3/2020 at 18, C.R. at 218. Although she was not approved for FMLA leave based on her mother-in-law's health condition, Employer did allow Claimant time off to care for her mother-in-law, as well as a period of bereavement following the mother-in-law's death. *See* N.T. 6/3/2020 at 17, C.R. at 217.

In September 2019, Employer issued Claimant a Final Written Warning In Lieu of Suspension (Final Written Warning) after she accrued an additional 4 points based on 8 further instances of tardiness. *See* F.F. 25; *see also* Final Written Warning, C.R. at 015-017. Claimant met with her supervisors and discussed this latest corrective action and work improvement plan. *See* F.F. 26. The Final Written Warning's Action Plan informed Claimant that she needed to be on time to work, that simply calling or texting did not excuse or eliminate tardiness infractions, and, again, that continued tardiness may result in additional corrective action, up to and

---

[7] 29 U.S.C. §§ 2601, 2611-2620, 2631-2636, 2851-2654.

[8] Claimant was approved for intermittent FMLA leave from March 2019 through September 2019 based on her own health condition(s). *See* F.F. 17; N.T. 6/3/2020 at 18; C.R. at 218.

6

including termination from employment. *See* F.F. 29; Final Written Warning at 1-2, C.R. at 015-016.[9]

Following the Final Written Warning, Claimant's instances of tardiness continued, with six additional instances of tardiness during September and October 2019. *See* F.F. 31, 32; N.T. 6/3/2020 at 6-7; C.R. at 206-07. Employer decided to be lenient,[10] however, and did not terminate Claimant based on these continuing

---

[9] Specifically, the Final Written Warning's Action Plan provided:

> [Claimant] will again discuss reasons for failing to arrive as scheduled in spite of repeated explanation of the progression of corrective action if this is not rectified. Although the previous car problems that were the stated reasons for lateness seem to have been resolved for the most part, it appears that there are still impediments to the ability to plan for timely arrival. Program Supervisor has advised [Claimant] that although life problems may arise, simply stating via text or call that she is running late does not excuse or eliminate the infraction. [Claimant] will put into immediate action reliable methods to prevent further tardiness. It is still unclear to this writer (Program Supervisor) whether [Claimant] truly believes in the necessity of correcting this problem or understands the consequences associated with lack of improvement as have been reiterated on her prior occasions, with her voiced understanding.
>
> In addition[,] during discussion the need to remember to swipe in on arrival will be stressed as [Claimant] has missed 7 more swipes since the initial corrective action.
>
> A work improvement plan is being instituted to accompany this corrective action.
>
> If you either fail to demonstrate immediate and sustained improvement or further violate [Employer]/departmental policy, practice or procedure, you may receive additional corrective action, up to and including termination from employment.

Final Written Warning at 1-2; C.R. at 015-016.

[10] Claimant's care of her ill mother-in-law factored into the leniency decision. *See* N.T. 6/3/2020 at 22; C.R. at 222.

7

instances of tardiness. *See* F.F. 30; N.T. 6/3/2020 at 7-8; C.R. at 207-08. Instead, Claimant's immediate supervisor emailed Claimant in late October 2019, indicating that Employer would not terminate her for the continued tardies, but that she needed to be present and ready to start her duties at 10 a.m. thereafter.[11] *See* N.T. 6/3/2020 at 8; C.R. at 208.

Unfortunately, following the October 2019 email, Claimant continued to be tardy. *See* F.F. 32; N.T. 6/3/2020 at 8; C.R. at 208. Claimant amassed an additional 7 tardies during November and December of 2019. *See* F.F. 32; N.T. 6/3/2020 at 8-9; C.R. at 208-09. Claimant's supervisor contacted Employer's human resources (HR) department to inquire as to the action that should be taken in response to Claimant's continued tardiness. *See* F.F. 33; N.T. 6/3/2020 at 9, C.R. at 209. The HR department determined that, as a result of Claimant's failure to make significant improvement regarding her instances of tardiness in the time since the Final Written Warning,[12] Claimant's employment with Employer would be terminated.[13] *See* F.F. 34; N.T. 6/3/2020 at 9; C.R. at 209. Accordingly, on January 16, 2020, Claimant's supervisors and Employer's HR personnel met with Claimant and informed her that, as a result of continued instances of tardiness in spite of repeated warnings,

---

[11] Claimant's supervisor explained that Claimant's continued tardiness interrupted the group sessions Claimant was supposed to lead at 10:30 a.m., put a burden on the rest of the staff because the inpatients would be waiting, and was also contrary to what Employer was trying to teach the inpatients in terms of successful recovery. *See* N.T. 6/3/2020 at 8; C.R. at 208.

[12] By this point, Claimant had amassed 21 points based on the Tardiness Policy. *See* F.F. 34.

[13] Claimant amassed 3 additional instances of tardiness after December 19, 2019, but before her termination on January 16, 2020. *See* F.F. 33; N.T. 6/3/2020 at 9; C.R. at 209. Employer's HR department was unaware of these further instances of tardiness at the time the termination decision was communicated to Claimant. *See* N.T. 6/3/2020 at 9; C.R. at 209.

8

counseling, work plans, and corrective actions, Claimant was being discharged, effective immediately. *See* F.F. 35; N.T. 6/3/2020 at 9; C.R. at 209.

Based on these facts, the referee found that Employer had an established attendance and tardiness policy with a point system and progressive discipline. *See* Referee's Decision at 3 (pagination supplied). Further, the referee determined that Claimant continually violated the Tardiness Policy despite Employer changing her start time, reminding her of the requirements of the Tardiness Policy, and offering suggestions to help her present to work on time. *See id.* The referee also noted that Claimant had not informed Employer of her learning disability until she received a corrective action plan, and that the only accommodation she requested thereafter had been a computer dictation program, which Employer provided. *See id.* at 3-4. The referee further noted that Employer was lenient with Claimant by considering the challenges of Claimant's personal life and allowing her to amass 21 tardiness points, despite the fact that only 10 points would have justified Claimant's termination under the Tardiness Policy. *See id.* at 4. The referee ultimately determined that Employer met its burden of proof to establish that Claimant's discharge was based on willful misconduct in connection with her work and denied Claimant UC benefits in accordance with section 402(e) of the Law, which determination the Board affirmed. *See* Referee's Decision at 4; Board Order at 1-2. Claimant then petitioned this Court for review.[14]

---

[14] This Court's review is limited to a determination of whether substantial evidence supported necessary findings of fact, whether errors of law were committed, or whether constitutional rights were violated. *See Johns v. Unemployment Comp. Bd. of Rev.*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014). As the prevailing party below, Employer is entitled to the benefit of all reasonable inferences drawn from the evidence on review. *See Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

9

## II. Issues

Claimant contends the Board erred in affirming the referee's determination that Claimant was ineligible for UC benefits under Section 402(e) of the Law. *See* Claimant's Brief at 4, 11-16. Specifically, Claimant argues Employer failed to meet its burden of proving willful misconduct that would make her ineligible for benefits under Section 402(e) of the Law, and further that, if Employer established willful misconduct, Claimant had good cause for such misconduct. *See id.* at 11-16.

## III. Discussion

Initially, we note that

> the Board, not the referee, is the ultimate fact finding body and arbiter of credibility in UC cases. Questions of credibility and the resolution of evidentiary conflicts are within the discretion of the Board and are not subject to re-evaluation on judicial review. The Board . . . may reject even uncontradicted testimony if it is deemed not credible or worthy of belief. We are bound by the Board's findings so long as there is substantial evidence in the record, taken as a whole, supporting those findings.

*Waverly Heights, Ltd. v. Unemployment Comp. Bd. of Rev.*, 173 A.3d 1224, 1227-28 (Pa. Cmwlth. 2017) (internal citations, quotations, and brackets omitted). Section 402(e) of the Law provides that an employee will be ineligible for UC benefits for any week in which "[her] unemployment is due to [her] discharge or temporary suspension from work for willful misconduct connected with [her] work[.]" 43 P.S. § 802(e). The question of whether an employee's actions constitute willful misconduct is a question of law subject to review by this Court. *See Reading*

*Area Water Auth. v. Unemployment Comp. Bd. of Rev.*, 137 A.3d 658, 661 (Pa. Cmwlth. 2016).

For purposes of determining a discharged employee's eligibility for unemployment compensation, the employer bears the burden of proving that the employee engaged in willful misconduct connected with his work. *See* Section 402(e) of the Law, 43 P.S. § 802(e); *Adams v. Unemployment Comp. Bd. of Rev.*, 56 A.3d 76, 78-79 (Pa. Cmwlth. 2012). This Court has defined willful misconduct as

> (1) wanton and willful disregard of an employer's interests; (2) deliberate violation of [an employer's] rules; (3) disregard of the standards of behavior which an employer can rightfully expect from an employee; or, (4) negligence showing an intentional disregard of the employer's interests or the employee's duties and obligations.

*Waverly Heights*, 173 A.3d at 1228 (quoting *Johns v. Unemployment Comp. Bd. of Rev.*, 87 A.3d 1006, 1009 (Pa. Cmwlth. 2014)). Once the employer establishes a *prima facie* case of willful misconduct, the burden shifts to the claimant to prove good cause for her actions. *See Downey v. Unemployment Comp. Bd. of Rev.*, 913 A.2d 351, 353 (Pa. Cmwlth. 2006).

"Where an employer seeks to deny UC benefits based on a work[]rule violation, the employer must prove the existence of a work rule, the reasonableness of the rule and the employee's violation of the rule." *Waverly Heights*, 173 A.3d at 1228 (internal citation omitted). An inadvertent or negligent violation of an employer's rule may not constitute willful misconduct. *See Chester Cmty. Charter Sch. v. Unemployment Comp. Bd. of Rev.*, 138 A.3d 50, 55 (Pa. Cmwlth. 2016). "Thus, a determination of what amounts to willful misconduct requires a consideration of all of the circumstances, including the reasons for the employee's

11

noncompliance with the employer's directives." *Eshbach v. Unemployment Comp. Bd. of Rev.*, 855 A.2d 943, 947-48 (Pa. Cmwlth. 2004) (internal quotation marks and citation omitted). Where the employee's action is justifiable or reasonable under the circumstances, it cannot be considered willful misconduct. *See id*. at 948.

"It is well settled that habitual tardiness can constitute willful misconduct, thus justifying the denial of benefits." *Cipriani v. Unemployment Comp. Bd. of Rev.*, 466 A.2d 1102, 1104 (Pa. Cmwlth. 1983); *see also Grand Sport Auto Body v. Unemployment Comp. Bd. of Rev.*, 55 A.3d 186, 190 (Pa. Cmwlth. 2012) ("Excessive absenteeism or tardiness may constitute willful misconduct."). This is so because "[e]mployers have the right to expect that employees will attend work when they are scheduled, that they will be on time, and that they will not leave work early without permission." *Grand Sport*, 55 A.3d at 190 (internal citation, quotation marks, and ellipses omitted). Thus, habitual tardiness "is inimical to an employer's interest." *Id.* For this reason, this Court has "repeatedly held that habitual tardiness is adequate ground[s] for a finding of willful misconduct." *Id.*; *see also Ellis v. Unemployment Comp. Bd. of Rev.*, 59 A.3d 1159, 1163-64 (Pa. Cmwlth. 2013) (claimant's 6 tardies within 2½ weeks without good cause sufficient to find willful misconduct); *Dotson v. Unemployment Comp. Bd. of Rev.*, 425 A.2d 1219, 1220 (Pa. Cmwlth. 1981) (benefits denial appropriate where claimant was late 27 times and absent 7 times during two-year period and court rejected claim of good cause based on claimant illness); *Bowers v. Unemployment Comp. Bd. of Rev.*, 392 A.2d 890, 892 (Pa. Cmwlth. 1978) (benefits denied where claimant was late 12 times during four-month period); *Unemployment Comp. Bd. of Rev. v. Glenn*, 350 A.2d 890, 892 (Pa. Cmwlth. 1976) (benefits denied where Board rejected claimant's contention that chronic lateness was due to illness).

Here, Employer terminated Claimant's employment based on Claimant's repeated instances of tardiness. Employer's Tardiness Policy defines "tardiness" as follows:

> When a staff member is not on the job at the time work is normally scheduled to begin at the start of the work day and/or when returning from approved breaks. For instance, if the shift starts at 7:00 a.m., staff are expected to be at the work station at 7:00 a.m. and prepared to work.

Tardiness Policy at 1, C.R. at 022. The Tardiness Policy further explains that "[e]mployees will receive one-half of a point (.5) for each instance of tardiness" and that the assessment of a total of 10 points for tardiness even with proper notification to Employer constitutes grounds for termination. *Id.* at 1, 4. Claimant received a copy of the Tardiness Policy, which was also explained to her multiple times. *See* N.T. 6/3/2020 at 4, 32. Notwithstanding, Claimant amassed 21 points for tardiness from March through December 2019, a total representing 42 instances of tardiness during that period,[15] more than double the number of points that would have justified Claimant's discharge. *See* Referee's Decision at 4; Board Order at 1. These tardies established a *prima facie* case for Claimant's willful misconduct by repeated, continued tardiness, and we find no error in the Board's conclusion to that effect.

"The issue of whether good cause exists is a factual one for the Board to resolve." *Ellis*, 59 A.3d at 1164. Here, the Board concluded that

> [C]laimant did not meet her burden to prove that she had good cause for her tardies. [C]laimant's reasons for her tardiness are vague and repetitive, *e.g.*, difficulty telling

---

[15] This figure does not include additional instances of Claimant's tardiness that may have been occasioned by difficulties with the time clock swiping of Claimant's identification card, which instances Employer did not count against Claimant. *See* N.T. 6/3/2020 at 20, C.R. at 220.

13

> time, car trouble, snowy weather, or caring for her mother-in-law. Notably, [E]mployer attempted to accommodate [C]laimant's issues with tardiness, and was lenient with her, but she still accumulated 21 points.

Board Order at 1. The Board maintains the exclusive province to make this finding, which cannot be impugned on appeal. *See Waverly Heights*, 173 A.3d at 1227-28; *Ellis*, 59 A.3d at 1164.

## IV. Conclusion

Based on the above, we conclude that substantial evidence existed to support the Board's findings of fact upon which it affirmed the referee's denial of UC benefits. Accordingly, we affirm the Board's decision finding Claimant ineligible for UC benefits under section 402(e) of the Law.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Angela Martin-Horn,             :
            Petitioner        :
            :
       v.             :
            :
Unemployment Compensation    :
Board of Review,            :    No. 1206 C.D. 2020
            Respondent     :

## O R D E R

AND NOW, this 19th day of April, 2022, the October 26, 2020 order of the Unemployment Compensation Board of Review is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge